Filed 4/8/14  In re Josh Q. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re JOSH Q., et al., Persons Coming Under the Juvenile Court Law. | D064748 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. CJ1067B-C) |
| v. | |
| MARA H., et al., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of San Diego County, Laura J.

Birkmeyer, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Appellant H. Q.

Christopher R. Booth, under appointment by the Court of Appeal, for Appellant

Mara H.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County

Counsel, and Daniela Davidian, Deputy County Counsel, for Plaintiff and Respondent.

Mara H. and H.Q. appeal juvenile court orders denying Mara's petition for modification under Welfare and Institutions Code section 388,[1] and terminating their parental rights to their minor children, Josh Q. and S.Q. (together, the minors), under section 366.26. Mara contends the court erred by denying her section 388 modification petition by which she sought to have the minors returned to her custody or, alternatively, to reinstate family reunification services. She further asserts the court should have applied the beneficial parent-child relationship exception to adoption to preclude terminating her parental rights. H.Q. contends the sibling-relationship exception to adoption applied to preclude terminating parental rights. We affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

Six-year-old Josh, 14-month-old S.Q. and their 11-year-old half brother, Marcos G., were taken into protective custody by the San Diego Health and Human Services Agency (Agency) after law enforcement raided the home of the minors' maternal grandmother where the family was living. H.Q. attempted to flee, but was arrested and charged with possession of methamphetamine. The maternal grandmother and her boyfriend were also arrested and charged with possession. Drugs and drug paraphernalia, including razor blades, were found throughout the home and within the children's reach. After the minors were taken into custody, S.Q. tested positive for methamphetamine.

Mara had a long history of drug abuse, including using methamphetamine during her pregnancy with S.Q. In interviews with the Agency's social workers after the raid,

---

[1] Statutory references are to the Welfare and Institutions Code.

2

Mara admitted using marijuana, but denied using methamphetamine recently or having any knowledge about its use in her home. Mara did not know why her one-year-old daughter tested positive for methamphetamine.

After the minors were taken into protective custody, the Agency filed petitions in the juvenile court under section 300, subdivision (b), alleging the minors suffered or were at substantial risk of suffering serious physical harm as a result of their exposure to drugs and Mara and H.Q.'s inability to protect the minors or provide adequate care for them.[2] At the contested jurisdiction and disposition hearing, the court sustained the allegations of the petition, declared the minors dependents, and placed them in the home of Marcos's father and stepmother, Ruben and Lisa G. The court ordered reunification services for both parents, set the six-month review hearing and advised Mara and H.Q. that because of S.Q.'s age it could limit reunification services to a period of six months.

Thereafter, S.Q. was referred to the San Diego Regional Center (Regional Center) and began services to address developmental delays. Josh began therapy for anxiety and depression related to the neglect he experienced while in his parents' care. During the six-month review period, Mara and H.Q. (when not incarcerated) attended weekly supervised visits with the minors. The visits reportedly went well, though Josh would come back home withdrawn and upset.

Mara's case plan required her to participate in individual therapy, parenting education classes, a drug treatment program and random drug testing. After six months,

---

2      After Marcos was taken into protective custody, he went to live with his father and stepmother. The Agency dismissed its petition on behalf of Marcos.

she had not made substantive progress with the plan. While Mara did not have any positive drug tests, she regularly missed tests and only sporadically attended the drug treatment program. By the sixth month of services, Mara was considered missing from her drug program, had not completed her parenting class requirement and had only attended one therapy session. Mara admitted her mother's home was not a safe environment for her children, but continued to reside there with H.Q.

H.Q.'s progress with his case plan was worse. He remained on probation throughout the period and near the end was incarcerated for 18 days on additional drug-related charges. H.Q. did complete a handful of substance abuse and parenting classes, but not through court approved providers. He did not enroll in any of the services required by his case plan or attend therapy, and repeatedly missed drug tests and appointments with the Agency's social worker. Because of the parents' lack of progress, the Agency recommended termination of reunification services and that the court set a section 366.26 permanency planning hearing. The parents contested the Agency's recommendation and the juvenile court set an evidentiary hearing.

Before the hearing, Ruben and Lisa became overwhelmed by caring for S.Q., who required a lot of attention, in addition to their own six children and Josh. They also did not want to adopt the minors. As a result, the Agency began to transition the minors to a new foster home, which was completed before the hearing. Also before the hearing, Mara entered a residential drug treatment program. On the day she entered the program she was five months pregnant and tested positive for methamphetamine. Mara admitted using methamphetamine and that she knew she was pregnant at the time. Just before

4

Mara entered treatment, law enforcement again raided Mara's mother's home. H.Q. was arrested for possession. He was released, but within a month was arrested again on additional drug-related charges and remained incarcerated through the rest of the proceeding.

After the contested review hearing, the juvenile court found that the Agency had provided reasonable services, but that Mara and H.Q. had not made substantive progress with their case plans. The court found there was not a substantial probability the minors could be returned to their parents' care within the 12-month review period. The court terminated reunification services and set a section 366.26 hearing. The juvenile court recognized Mara had recently entered a residential drug treatment program, but emphasized her failure to make any substantive progress until then.[3]

After the review hearing, Mara continued to engage in services. She completed the residential drug treatment program she entered before the hearing and shortly after gave birth to a daughter, C.Q. C.Q. was subject to a separate dependency proceeding, but because Mara continued to engage in her case plan and remain sober, C.Q. was placed with her. Mara and C.Q. moved out of Mara's mother's home and into a sober living environment. Mara completed an aftercare drug program, attended Narcotics Anonymous meetings and obtained a sponsor. She also completed additional parenting courses and attended therapy regularly. During this time, Mara continued to have weekly

---

[3]     Mara and H.Q. both filed notices of their intent to file petitions for writs of mandate challenging the juvenile court's orders terminating reunification services and setting a permanency planning hearing. This court dismissed the notices after attorneys for both parents indicated there were no viable issues for review.

supervised visits with Josh and S.Q. H.Q., who remained incarcerated, occasionally spoke with Josh and S.Q. on the phone and the minors visited him once in jail. H.Q. also sent Josh and S.Q. gifts, including a video of him reading to them.

In the months after the review hearing, Josh and S.Q. adjusted to their new foster home and were doing well there. The foster parents wanted to adopt the minors and had an approved adoption home study. S.Q. continued to receive services through the Regional Center and Josh regularly attended therapy. Both saw improvements in their developmental and emotional health. By the time of the section 366.26 hearing, Josh, who was diagnosed with an adjustment disorder with anxiety and a depressed mood at the beginning of the dependency, was no longer displaying any depressive behavior and no longer needed regular therapy. S.Q.'s developmental delays also resolved.

Josh and S.Q. were happy to see Mara when their visits began and separated easily from her at the end. The minors were also happy to be reunited with their foster parents after visits with Mara. Josh, who was seven at the time, expressed mixed feelings about whether he wanted to live with Mara or remain with his foster parents. When the Agency's social worker asked him after a visit with Mara where he wanted to live, he said he wanted to live with Mara and his foster mother. Once Josh was reunited with the foster mother, he stated excitedly in her presence that he wanted to live with her. As time passed, Josh's interest in visiting with Mara lessened. At one point he told the social worker he did not want to attend visits anymore.

Mara also brought C.Q. to her visits with Josh and S.Q. S.Q. took an interest in C.Q. at the visits, while Josh was indifferent to the baby. After Josh and S.Q. were

6

removed from Ruben and Lisa's home, their new foster family facilitated visits between Josh and S.Q. and Marcos, and the siblings talked on the phone and exchanged photos. The foster parents expressed interest in maintaining contact with Marcos if they adopted Josh and S.Q. Before the section 366.26 hearing, the social worker scheduled a psychological examination to further evaluate Josh's feelings about his placement. The psychologist's report indicated Josh had a clear preference to remain with the foster parents. The psychologist also reported Josh missed and worried about Marcos, and wished he could spend more time with Marcos.

Before the permanency planning hearing, Mara filed a section 388 petition requesting the juvenile court reverse its prior order and return Josh and S.Q. to her care with family maintenance services, or reinstate reunification services. As changed circumstances, Mara pointed to her completion of residential and aftercare drug treatment, her sobriety, her engagement in other services, including parenting classes and therapy, and the fact that C.Q. was permitted to remain in her care.

The juvenile court found Mara's petition made a prima facie showing her circumstances had changed and the proposed modification was in the minors' best interests. The court set the hearing on the section 388 petition with the contested section 366.26 hearing. At the hearing, the juvenile court received the Agency's reports in both Josh and S.Q.'s and C.Q.'s proceedings into evidence.[4] Mara, Josh and S.Q.'s social worker, and C.Q.'s social worker, testified. The court found Mara had shown changed

_____

[4] C.Q.'s dependency was terminated just before the hearing.

7

circumstances but that it was not in the children's best interests to grant the section 388 petition. The juvenile court found by clear and convincing evidence the minors were likely to be adopted and that no statutory exception to adoption applied. The court terminated the parental rights of Mara and H.Q.

DISCUSSION

I

Mara contends the court erred by denying her section 388 modification petition. She argues she adequately showed changed circumstances and the proposed modification was in the best interests of Josh and S.Q.

A

Under section 388, a party may petition the court to change, modify or set aside a previous court order. The petitioning party has the burden of showing, by a preponderance of the evidence, there is a change of circumstances or new evidence, and the proposed change is in the child's best interests. (§ 388; *In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416.) Whether a previous court order should be modified and a change would be in the child's best interests are questions within the sound discretion of the juvenile court. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) The order will not be disturbed on appeal unless the court has exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination. When two or more inferences reasonably can be deduced from the facts, we have no authority to reweigh the evidence or substitute our decision for that of the juvenile court. (*In re Stephanie M.*, at pp. 318-319.) In ruling on a modification

8

petition, the court may consider the entire factual and procedural history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)

B

Mara contends the court erred by not finding changed circumstances and that her proposed modification to the court's order setting a permanency planning hearing was in the minors' best interests. Mara's complaints concerning changed circumstances are without merit. The juvenile court explicitly found Mara proved changed circumstances and the court appropriately considered Mara's history of drug abuse in the context of its best interest determination. (See *In re Jasmon O., supra*, 8 Cal.4th at p. 424 [" 'a measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child.' [Citation.]"].) The juvenile court did not abuse its discretion by finding that returning the minors to Mara or providing additional reunification services to her was not in the best interests of Josh and S.Q.

The problems that led to the dependency, Mara's drug abuse and H.Q.'s drug abuse and criminal activity, were extremely serious. (See *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531 ["the gravity of the problem leading to the dependency, and the reason that problem was not overcome by the final review, must be taken into account"].) At the time of her petition, Mara was at the beginning stages of recovery after a history of off and on methamphetamine use spanning 18 years. Mara completed similar drug treatment programs in the past and relapsed, including twice while pregnant. Mara also did not show insight into the events that led to the Agency's involvement with her family. She believed that at the times she was using drugs, she was capable of caring for her

9

children. Mara continued to deny knowledge that drug activity was occurring in her mother's home while she lived there despite overwhelming evidence of its presence. Mara's current sobriety also coincided with H.Q.'s incarceration. Mara testified she and H.Q. remained in a relationship, and it had yet to be seen whether she could maintain the changes she had made once H.Q. was released from prison.

Further, although Josh and S.Q. loved Mara, they were not strongly bonded with her. Josh wanted to be adopted by his foster parents. By the time of the hearing, S.Q. had been out of Mara's care for over half of her life. S.Q. was bonded to the foster parents and was happy and excited to be reunited with them after visits with Mara. While Mara's recent strides are laudable, on this record we cannot conclude the juvenile court's order was an abuse of discretion.[5]

## II

Mara next contends the evidence supported a finding the beneficial parent-child relationship exception applied to preclude terminating her parental rights.

## A

After reunification services are terminated, the focus of a dependency proceeding shifts from preserving the family to promoting the best interests of the child, including

---

[5] Mara argues it was implausible for the juvenile court to deny her petition for modification because C.Q.'s proceeding was terminated without her removal from Mara's custody. Mara, however, did not delay in her compliance with the plan set in C.Q.'s case and immediately engaged in services. In Josh and S.Q.'s case, Mara failed to actively engage in services until she became pregnant with C.Q. and H.Q. was incarcerated, after the six-month review period was over. We find no inconsistency in the different outcomes reached in the two cases.

the child's interest in a stable, permanent placement that allows the caregiver to make a full emotional commitment to the child. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.) At the selection and implementation hearing, the court has three options: (1) terminate parental rights and order adoption as the permanent plan; (2) appoint a legal guardian for the child; or (3) order the child placed in long-term foster care. (*Ibid.*)

"Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) If the court finds a child cannot be returned to his or her parent and is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless it finds a compelling reason for determining that termination of parental rights would be detrimental to the child under one or more of the enumerated statutory exceptions. (§ 366.26, subd. (c)(1)(A) & (B)(i)-(vi); *In re A.A.* (2008) 167 Cal.App.4th 1292, 1320.) "The parent has the burden of establishing the existence of any circumstance that constitutes an exception to termination of parental rights." (*In re T.S.* (2009) 175 Cal.App.4th 1031, 1039.) Because a selection and implementation hearing occurs "after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

Section 366.26, subdivision (c)(1)(B)(i) provides an exception to the adoption preference if terminating parental rights would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." We have interpreted the phrase "benefit from

11

continuing the . . . relationship" (*ibid.*) to refer to a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575; accord *In re Jason J.* (2009) 175 Cal.App.4th 922, 936-937.)

To meet the burden of proof for this statutory exception, the parent must show more than frequent and loving contact, an emotional bond with the child or pleasant visits. (*In re Jason J., supra*, 175 Cal.App.4th at pp. 936-937.) The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive emotional attachment from child to parent. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324.)

We review the court's finding regarding the applicability of a statutory exception to adoption for substantial evidence. (*In re Autumn H., supra*, 27 Cal.App.4th at p. 576.) In this regard, we do not consider the credibility of witnesses, resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is substantial evidence supporting a contrary finding. (*In re Casey D.*

12

(1999) 70 Cal.App.4th 38, 52-53.) On appeal, the parent has the burden of showing there is no evidence of a sufficiently substantial nature to support the court's finding or order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

B

Mara maintained regular visitation and contact with the minors. However, the record supports that she did not show a beneficial parent-child relationship sufficient to apply the exception of section 366.26, subdivision (c)(1)(B)(i).

As discussed, Mara was not able to ameliorate the risks that caused the dependency. Mara failed to make substantive progress with her case plan, she regularly missed drug tests, failed to participate in services and continued to live in the dangerous home from which Josh and S.Q. were removed. It was not until H.Q. was incarcerated for the third time in the course of this proceeding and she was five months pregnant that Mara began to engage in the services the Agency offered her. Even then, Mara continued to deny any knowledge of the apparent dangers of her former living conditions.

Mara was able to maintain a positive relationship with Josh and S.Q. during and after the reunification period. S.Q. was happy and excited to see Mara at visits. Josh was also happy to see Mara, but his interest in visits waned over time and neither child had difficulty separating from Mara. The visits were reported to be positive and appropriate. However, "[a] biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) Moreover, Josh wanted to be adopted by his

13

foster family, and both Josh and S.Q. viewed them as parents.[6] The love and affection

Mara shared with the minors during visits was not enough to show the minors had a

" 'significant, positive, emotional attachment' " to Mara such that terminating the parent-

child relationship would result in harm to them. (*In re Jason J., supra*, 175 Cal.App.4th

at pp. 936-938; *In re Autumn H., supra*, 27 Cal.App.4th at p. 575.)

Further, the record supports that Mara did not show maintaining the parent-child

relationship outweighed the benefits of adoption. In the opinions of the social worker

and the psychologist who evaluated Josh, the minors' needs for stability, safety and

permanency clearly outweighed any possible detriment that would be caused by severing

the parental relationship. The court appropriately weighed the strength and quality of the

parent-child relationship, and the detriment involved in terminating it, against the

potential benefit of an adoptive home for Josh and S.Q. Its finding in this regard was

supported by the evidence and we cannot reweigh that evidence or substitute our

---

6     Mara suggests Josh's stated desire to be adopted by his foster parents should not have been considered by the court because his statements were made in the presence of the foster mother and at her prompting. The record does not substantiate this claim. Josh stated he wanted to be adopted by his foster mother both in and outside of her presence; at other times he stated he wanted to live with Mara. The psychologist tasked with evaluating Josh's wishes interviewed Josh and the foster mother together, and interviewed and tested Josh alone. The juvenile court properly considered these facts.

judgment for that of the juvenile court. (*In re Casey D., supra*, 70 Cal.App.4th at pp. 52-53.)[7]

III

H.Q. argues the sibling-relationship exception to adoption precluded the termination of parental rights; Mara joins in this argument.

A

The sibling relationship exception to adoption applies when the juvenile court finds that terminating parental rights would be detrimental to the child because it would substantially interfere with the child's sibling relationship. (§ 366.26, subd. (c)(1)(B)(v).) Factors to be considered include the nature and extent of the relationship, whether the child was raised with a sibling in the same home and whether the child has strong bonds with a sibling. The court must also consider whether ongoing contact is in the child's best interests, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption. (*Ibid.*) The purpose of this exception is to preserve long-standing sibling relationships that "serve as anchors for dependent children whose lives are in turmoil." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 404.)

---

[7] Mara's reliance on *In re S.B.* (2008) 164 Cal.App.4th 289, is misplaced. "*S.B.* is confined to its extraordinary facts." (*In re C.F.* (2011) 193 Cal.App.4th 549, 558.) In *S.B.*, the evidence showed that despite the child's strong, positive, significant relationship with her caregiver, she would be "greatly harmed" by the loss of the equally significant, positive relationship she shared with her father. (*In re S.B.*, at p. 300.) Additionally, the father in that case had complied with every aspect of his case plan and the child wanted to live with him. (*Id.* at pp. 300-301.) Here, in contrast, Mara made no such showing.

15

"The sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption." (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) Application of the sibling relationship exception requires a balancing of interests. (*In re L.Y.L., supra*, 101 Cal.App.4th at p. 951.) The parent must first show that: (1) a significant sibling relationship exists; (2) terminating parental rights would substantially interfere with that relationship; and (3) it would be detrimental to the child if the relationship ended. (*Id.* at p. 952.) After the parent shows that a sibling relationship is so strong that its severance would be detrimental to the adoptive child, the court then decides whether the benefit to the child of continuing the sibling relationship outweighs the benefits of adoption. (*Id.* at pp. 952-953; *In re Naomi P.* (2005) 132 Cal.App.4th 808, 823.) We review the court's finding as to the applicability of this statutory exception to adoption for substantial evidence. (*In re D.M.* (2012) 205 Cal.App.4th 283, 293-294.)

B

H.Q. contends the juvenile court erred by finding the beneficial sibling relationship exception inapplicable because termination of parental rights will substantially interfere with Josh and S.Q.'s relationships with Marcos and C.Q.[8] With respect to Marcos, the juvenile court found that Josh was bonded to Marcos. The evidence supported this finding. Josh and Marcos lived together for most of their lives. Josh loved his brother and once they were separated he missed Marcos very much. With respect to C.Q., S.Q. and Josh know C.Q. is their sister and spent time with C.Q. at their

---

[8]     Josh and S.Q. are a bonded sibling set and all parties agree their interests should be considered together.

16

weekly visits with Mara. S.Q.'s interactions with C.Q. were positive and S.Q. was interested in the baby and affectionate toward her. Josh was not interested in C.Q.

The court did not err by finding H.Q. did not meet his burden to show the relationship the minors had with Marcos or C.Q. was sufficiently significant to constitute a "compelling reason" to order a permanent plan other than adoption for the minors. (§ 366.26, subd. (c)(1)(B).) Although S.Q. enjoyed visiting C.Q., she separated easily from the baby and there was no evidence C.Q.'s absence from her life caused any adverse effect. The same was true for Josh and Marcos. Josh told the psychologist and social worker he missed his half brother, but he was happy with his foster parents and wanted them to adopt him and S.Q. From this evidence, the court could reasonably infer that interference with the sibling relationships would not be detrimental to the minors.[9] (*In re Erik P., supra*, 104 Cal.App.4th at p. 403; see also *In re Celine R.* (2003) 31 Cal.4th 45, 54 [sibling exception to adoption applies only if evidence shows adoption would be detrimental to the child who is the subject of the recommendation for adoption].)

The evidence also supported the court's finding that the benefit to the minors of continuing either sibling relationship was outweighed by the benefits they would realize through adoption. After being declared dependents of the juvenile court, Josh underwent intensive therapy to deal with the trauma caused by Mara and H.Q., and S.Q. became a client of the Regional Center to deal with her development delays. Once removed from Mara and H.Q.'s care and provided access to these services by their foster parents, the

---

[9]    Additionally, there was no indication that Marcos would leave his father's home and return to Mara's care even if Mara and H.Q.'s parental rights were not terminated.

17

minors thrived. The minors' need for competent, caring and stable parents is paramount, and can best be realized through the permanency of adoption. (*In re L.Y.L., supra*, 101 Cal.App.4th at pp. 952-953; *In re Megan S.* (2002) 104 Cal.App.4th 247, 252.) In sum, substantial evidence supported the court's finding the sibling relationship exception to adoption did not apply.[10] (*In re Celine R., supra*, 31 Cal.4th at pp. 61-62.)

DISPOSITION

The orders are affirmed.


HALLER, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.

---

[10] Moreover, the minors' prospective adoptive parents voiced willingness to continue contact between the minors and Marcos. Although there are no guarantees sibling contact will continue after the minors are adopted, this factor is not determinative. (*In re Celine R., supra*, 31 Cal.4th at p. 55 [court cannot require, but can encourage, adoptive parents to agree to visits among siblings].)